UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                :
SERENA THOMAS, Individually     :
and as Administratrix ad        :
Prosequendum to the Estate of   :
CORNELL W. THOMAS, Deceased,    :   Civil Action No.
                                :   1:04-cv-3358 (NLH)
            Plaintiff,          :
                                :
        v.                      :      **OPINION**
                                :
CORRECTIONAL MEDICAL SERVICES,  :
INC., et al.,                   :
                                :
            Defendants.         :
_____:

APPEARANCES:
Daniel S. Weinstock, Esq.
FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER, ESQS.
20 Brace Road, Suite 112
Cherry Hill, NJ 08034
        and
Rosemary Pinto, Esq.
FELDMAN & PINTO
1604 Locust Street, 2R
Philadelphia, PA 19103
*Attorney for Plaintiffs*

Gary J. Lesneski, Esq.
Jeffrey M. Scott, Esq.
Kerri E. Chewing, Esq.
ARCHER & GREINER, P.C.
One Centennial Square, P.O. Box 3000
Haddonfield, NJ 08033-0968
*Attorneys for Defendants Correctional Medical Services, Inc.,*
*William Andrade, James J. Neal, M.D., James Ruman, R.N., Rock*
*Welch, Abu Ashan, M.D., Manuel Veloso, M.D., and Carol Gallagher,*
*N.P.*

David J. Bishop, Esq.
Crammer, Bishop, Marczyk & O'Brien, PC
508 New Jersey Avenue
Suite B3
Absecon, NJ 08201
*Attorney for Alyn R. Caulk, M.D.*

**HILLMAN, District Judge**

Plaintiff, Serena Thomas, brings this wrongful death and survival action on behalf of decedent, Cornell W. Thomas ("Thomas"), alleging that Defendants were negligent and deliberately indifferent to Thomas's serious medical needs by failing to inform him of his diagnosis and treat his hepatitis C ("HCV") while he was incarcerated.  Before the Court is a motion for summary judgment filed by Defendants Correctional Medical Services, Inc., William Andrade, James J. Neal, M.D., James Ruman, R.N., Rock Welch, Abu Ashan, M.D., Manuel Veloso, M.D., and Carol Gallagher N.P. (collectively, "CMS Defendants").[1] Their motion was joined by Defendant Alyn R. Caulk, M.D. (together with CMS Defendants, "Defendants").  For the reasons explained below, CMS's motion is granted in part and denied in part, and Dr. Caulk's motion is granted.

**I.   JURISDICTION**

Plaintiff has alleged that Defendants were deliberately indifferent to Thomas's serious medical needs in violation of his Eighth Amendment rights and, therefore, this Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  We exercise supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. §

---

[1]  Defendant Nicollette Ann Turner, M.D. was voluntarily dismissed from this action on December 10, 2007.

1367.

## II.   **BACKGROUND**

Thomas began serving a life sentence on November 4, 1977 at the age of twenty-six.  While incarcerated, Thomas was diagnosed with diabetes and was required to take insulin on a daily basis. His medical history shows that his diabetes was poorly controlled.  Tests taken in 1997 and 1998 showed that Thomas had elevated hemoglobin levels.  By 1999, his lab results indicated a risk of serious complications from his diabetes such as nephropathy.  In addition, Thomas had a history of anxiety, depression and cardiac problems.

On December 16, 1996, Thomas was diagnosed with HCV, but was not informed of his diagnosis at that time.  He also tested positive for HCV again in February and May 1998.  It was not until January 20, 2000, that Thomas was informed by Dr. Nicollette Turner that he had HCV.  At that time, Dr. Turner discussed Thomas's HCV with him, as well as his elevated liver function test and a plan for additional testing.  On February 3, 2000, Thomas was seen by Dr. Alyn Caulk who noted that Thomas had HCV and active liver disease.  During this time, Thomas's tests continued to show that he had protein in his liver which is an indication of diabetic nephropathy.

On August 4, 2000, Thomas's test results showed evidence of cirrhosis of the liver.  Although Thomas's liver function tests

3

showed slight improvement on August 17, 2000, by October 2000,
the results of an ultrasound showed that he had an enlarged
spleen secondary to HCV.  On February 14, 2001, Thomas was
counseled about his HCV by a CMS nurse.  Thereafter, on March 21,
2001, Thomas was seen again by Dr. Turner.

By March 2001, Thomas's liver function worsened and by April
26, 2001, a CT scan of Thomas's abdomen revealed cirrhosis with
ascites[2] and liver masses.  On June 5, 2001, Thomas met with Dr.
Caulk and discussed his recent lab results and a proposed
treatment plan.  Dr. Caulk noted a possible mass but a follow-up
CT directed biopsy did not reveal any lesion.  A gastrointestinal
consult was scheduled for June 20, 2001.

In January 2002, Dr. Caulk's notes indicate that Thomas had
end stage liver disease and ascites.  In March 2002, an
ultrasound showed multiple masses in the liver and Thomas was
seen by Dr. Gersten for cirrhosis and possible malignancy.  On
May 1, 2002, Thomas was seen by Dr. Ronayros who diagnosed him
with liver cancer.  The next day a CT scan was taken that showed
multiple lesions.  On July 5, 2002 after a phone consultation
with Dr. Gersten, Dr. Ronsayro noted that the only plan of
treatment was a liver transplant, and on July 11, 2002, Dr.

---

[2] "When the liver loses its ability to make the protein
albumin, water accumulates in the legs (edema) and abdomen
(ascites)." See http://digestive.niddk.nih.gov/ddiseases/pubs/
cirrhosis/.

Gersten recommended a "Levine shunt."[3]  On July 18, 2002, Thomas was found unresponsive and was sent to Cooper Hospital where he died later that day.

### III.  **DISCUSSION**

The three-count Complaint in this action alleges claims for violation of Section 1983 against all Defendants, negligence against Defendants CMS, Andrade, Neal, Ruman, Welch, and Ahsan, and medical malpractice against Defendants Caulk, Veloso, and Gallagher.[4]  Defendants now move for summary judgment on all three counts.

### A.  **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

[3]  A shunt, also called a Levine shunt, is surgically placed from the abdominal space (peritoneum) to the jugular vein in an effort to reduce ascites and reverse some of the symptoms of kidney failure. See http://www.nlm.nih.gov/medlineplus/ency/article/000489.htm.

[4]  Plaintiff initially brought these claims both on behalf of the Estate of Mr. Thomas as a survival action, pursuant to N.J.S.A. 2A:15-3, and on behalf of herself as a wrongful death action, pursuant to N.J.S.A. 2A:31-1.  However, Plaintiff has agreed to voluntarily withdraw her wrongful death claims because she is unable to show any pecuniary loss attributable to the death of Mr. Thomas.  Accordingly, Plaintiff's wrongful death claims are hereby dismissed.  The remainder of this opinion considers Plaintiff's claims only as a survival action on behalf of the Estate of Mr. Thomas.

the moving party is entitled to a judgment as a matter of law."
Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56(c).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit. Id. In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and
all justifiable inferences are to be drawn in his favor." Marino
v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)
(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact. Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial. Id. Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party. Anderson, 477 U.S. at 256-57. A

6

party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.  Statute of Limitations**

Defendants argue that Thomas's claims should be dismissed because they are barred by New Jersey's two-year statute of limitations.  See N.J.S.A. 2A:14-2 (establishing that a personal injury action must be commenced within two years after the cause of action has accrued); O'Connor v. City of Newark, 440 F.3d 125, 126-27 (3d Cir. 2006) (statute of limitations applied in a 42 U.S.C. § 1983 case depends upon the underlying state statute governing personal injury claims).  Specifically, they argue that as of 2000, but no later than 2001, Thomas knew or had reason to know that he had contracted HCV, but did not file his lawsuit until July 16, 2004.  Plaintiff argues that Thomas's claims should not be dismissed because they were tolled by the class action lawsuit, Bennett v. CMS, No. 02-4993 (NLH), and the discovery rule.  These arguments will be addressed in turn.

**1.  Tolling of Statute of Limitations Due to Filing of Class Action Lawsuit**

The parties agree that the limitations period for Thomas's survival action is two years.  Thomas does not dispute that his complaint was filed beyond the applicable limitations period, but argues that the statute of limitations was tolled by the filing of the class action lawsuit, Bennett v. CMS, on October 16,

2002.[5]

Counsel for Thomas previously raised the same tolling argument in a prior case before this Court, Smart-El v. CMS, 04-3414 (NLH).  In that case, the Court discussed the development of the tolling requirement.  In American Pipe & Const. Co. v. Utah, the Supreme Court held that the filing of a class action complaint tolls the statute of limitations for all purported members of the class who timely intervene "where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable.'"  414 U.S. 538, 552-53 (1974).  This rule was extended in Crown, Cork & Seal Co., Inc. v. Parker to toll the statute of limitations "for all members of the putative class until class certification is denied."  462 U.S. 345, 354 (1983).  "At that point, class members may choose to file their own suits or to intervene as Plaintiffs in the pending action."  Id.; see also Yang v. Odom, 392 F.3d 97, 111 (3d Cir. 2004) (holding that "where class certification has been denied solely on the basis of the lead Plaintiffs' deficiencies as class representatives, and not because of the suitability of the claims for class treatment, American Pipe tolling applies to subsequent class actions"), cert. denied, Odom v. Yang, 544 U.S. 1048 (2005).

---

[5]  On May 14, 2008, this Court entered an Order denying class certification in Bennett v. CMS, No. 02-4993 (NLH).

Here, a class action complaint was filed in Bennett v. CMS
in which Thomas was a purported member of the requested class.
The motion for class certification was denied by Order of this
Court, dated May 14, 2008.  American Pipe and Crown instruct us
that after the denial of class certification, class members may
be able to either file their own lawsuits or intervene.[6]  Thomas,
however, filed his complaint on July 16, 2004, almost four years
before the Court denied class certification.

In Wyser-Pratte Management Co., Inc. v. Telxon Corp., the
Sixth Circuit noted that "a number of district courts have held
that a plaintiff who chooses to file an independent action
without waiting for a determination on the class certification
issue may not rely on the American Pipe tolling doctrine."  413
F.3d 553, 568 (6th Cir. 2005).  The Sixth Circuit referred to
this scenario as a "forfeiture" of the class action tolling
doctrine and found that the purposes of American Pipe tolling are
not furthered when plaintiffs file independent actions before a
decision on the issue of class certification.[7]  Id. at 569.

---

[6]  In Bennett v. CMS, the motion for class certification was
denied in part because, other than numerosity, the Plaintiffs did
not satisfy the requirements of Fed. R. Civ. P. 23, which made
their section 1983 claims unsuitable for a class action.  As
such, American Pipe tolling may not be available to Thomas on
that basis.  See Yang, 392 F.3d at 111.  However, since Plaintiff
filed her Complaint before the denial of certification, this
issue will not be addressed in this Opinion.

[7]  The Sixth Circuit found no cases rejecting this
"forfeiture" argument.  See Wyser-Pratte, 413 F.3d at 569; see

Among the decisions relied upon by the Sixth Circuit was <u>In re</u>
<u>WorldCom, Inc. Sec. Litig.</u>, 294 F. Supp. 2d 431, 452 (S.D.N.Y.
2003), which extolled the benefits of preventing the filing of
additional lawsuits while a class certification is pending.
Indeed, as the <u>In re Worldcom</u> court noted,

> [m]any good purposes are served by such
> forbearance, as <u>American Pipe</u> and <u>Crown, Cork</u>
> themselves spell out.  The parties and courts
> will not be burdened by separate lawsuits
> which, in any event, may evaporate once a
> class has been certified.  At the point in a
> litigation when a decision on class
> certification is made, [plaintiffs] usually
> are in a far better position to evaluate
> whether they wish to proceed with their own
> lawsuit, or to join a class, if one has been
> certified.

294 F. Supp. 2d at 452, <u>reconsid.</u> <u>denied</u>, 308 F. Supp. 2d 214,
230 (S.D.N.Y. 2004); <u>see</u> <u>also</u> <u>Yang</u>, 392 F.3d at 111 (finding that
"it has been well-settled that would be class members are
justified -- even encouraged -- in relying on a class action to
represent their interests with respect to a particular claim or

---

also <u>In re Ciprofloxacin Hydrochloride Antitrust Litig.</u>, 261 F.
Supp. 2d 188, 221 (E.D.N.Y. 2003) (finding that filing of a
subsequent class action claim before the court determines class
certification in the initial action undermines the policy behind
the class action tolling doctrine); <u>Rahr v. Grant Thornton LLP</u>,
142 F. Supp. 2d 793, 800 (N.D. Tex. 2000) (finding class action
tolling doctrine was never intended to apply to plaintiffs who
file separate suits prior to a decision being reached on the
class certification issue); <u>Stutz v. Minn. Mining & Mfg. Co.</u>, 947
F. Supp. 399, 404 (S.D. Ind. 1996) (finding that "it is also true
that a class member has the option of pursuing an individual
claim if he opts out of a class action *after* it has been
certified").

claims, and in refraining from the unnecessary filing of repetitious claims").

This Court found no reason why the filing of the Bennett v. CMS class action case should toll the statute of limitations in Smart-El. Likewise, there is no reason why Bennett v. CMS should toll the statute of limitations for Plaintiff's claims, which were filed four years before the denial of the class certification. Plaintiff's lawsuit runs contrary to the intentions of the tolling rule to prevent the unnecessary filing of repetitious claims. See American Pipe, 414 U.S. at 550. Thus, the filing of the class action complaint in Bennett v. CMS did not toll the statute of limitations for Plaintiff's claims.

### 2. Statute of Limitations Tolling Under the Discovery Rule

Plaintiff also argues that Thomas's claims were tolled under New Jersey's "discovery rule." Under New Jersey law, tolling the statute of limitations under the discovery rule "may be applicable when 'injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another.'" Maldonado v. Leeds, 865 A.2d 741 (N.J. Super. App. Div. 2005); see also Baird v. Am. Med. Optics, 713 A.2d 1019 (N.J. 1998); Savage v. Old Bridge-Sayreville Medical Group, P.A., 633 A.2d 514, 518 (N.J. 1993) (holding that knowledge of fault for purposes of the discovery rule requires "only the awareness of

11

facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care"). "The discovery rule is essentially a rule of equity." Abboud v. Viscomi, 543 A.2d 29, 32 (N.J. 1988) (citing Lopez v. Swyer, 300 A.2d 563 (N.J. 1973)). Determining whether it applies requires "identification, evaluation, and weighing of the equitable claims of the parties." Id. (citing Vispisiano v. Ashland Chem. Co., 527 A.2d 66 (N.J. 1987)). It is the Plaintiff's burden to explain why he reasonably could not have discovered his cause of action in time to comply with the limitation period so as to justify the tolling of the statute of limitations. Phillips v. Gelpke, 921 A.2d 1067, 1076 (N.J. 2007) (citing Caravaggio v. D'Agostini, 765 A.2d 182 (2001) and 51 Am. Jur. 2d Limitation of Actions § 179 (2000)).

The facts in the record are clear that in 1996 Thomas was diagnosed with HCV and that CMS knew of his HCV but did not inform him of his diagnosis until 2000. Plaintiff admits that after 2000, Thomas knew he had HCV and cirrhosis of the liver and that "the Defendants were administering appropriate care to him for his Hepatitis C."[8] Plaintiff argues that even though Thomas

---

[8] Dr. Turner testified in her deposition that in 2000, she had discussions with Thomas about his HCV. She stated, "I would have discussed that he had it - made sure that he knows that he

knew he had HCV by 2000, she is "quite certain" that Defendants did not tell him that they withheld treatment and diagnosis from him for five years, and did not tell him that if they provided treatment and diagnosis earlier he would not be dying.  In other words, Plaintiff argues that Defendants should have told Thomas that he was denied proper treatment from 1996, when he was first diagnosed, until 2000.  Plaintiff also argues that the failure to inform Thomas of his HCV from 1996 until 2000 was due to CMS's policy of not telling inmates of their HCV diagnosis or providing treatment.

The fact that CMS knew that Thomas had HCV but failed to inform him of his diagnosis from 1996 until 2000 tolled the statute of limitations under the discovery rule until the time when Thomas learned both that he had HCV as early as 1996 and that he was not treated for it at that time.  See Abboud, 543 A.2d at 33.  In Abboud, the court found that a dentist's misrepresentations to the plaintiff that her condition was temporary and that her symptoms indicated that she was healing "reasonably induced her not to sue within the normal limitations period."  Id.  Here, although Thomas learned of his condition in

---

had Hepatitis C."  Plaintiff admits that "Dr. Turner would have told Mr. Thomas he had Hepatitis C and he was not a candidate for treatment."  After his visit with Dr. Turner in 2000, Thomas continued to see CMS doctors who monitored his liver, including administering liver function tests and CT scans.  Thus, Thomas was aware of his health condition at that time.

13

2000, there is no evidence of when he learned that he had the virus since 1996 and that Defendants failed to provide any treatment for his condition when it was first diagnosed.

Defendants argue that there was nothing preventing Thomas from understanding that he may have had a claim as early as July 2001, and that he had the "building blocks" for the formation of a potential lawsuit against his medical providers at that time. Defendants do not assert, however, any facts showing Thomas understood the cause of his injury at that time.  The discovery rule applies not only when the party is reasonably unaware of his injury, but also when he is aware of his injury and does not know that the injury is attributable to the fault of another.  <u>See</u> <u>Maldonado</u>, 865 A.2d at 741.  Here, the statute of limitations began to run on the day that Thomas understood, or reasonably could have understood, that he had been diagnosed in 1996 with HCV but that CMS failed to inform him of his diagnosis, and that the failure to provide him treatment from 1996 until either 2000 or 2001 allegedly compromised his health.  Defendants have not provided any facts that show Thomas knew, or reasonably should have known, before July 16, 2002 (two years before Plaintiff filed her lawsuit), that he had been diagnosed in 1996 and that the failure to provide treatment for his HCV until approximately

2000 was the cause of his alleged injury.[9]

Thus, the discovery rule applies and tolled Thomas's survival claims until the date that he knew, or reasonably should have known, of his injury.  Defendants' Motions for Summary Judgment are therefore denied without prejudice with respect to the statute of limitations issue.

### C.   Section 1983 Claims

In Count I of the Complaint, Plaintiff alleges that Defendants violated Section 1983 by showing deliberate indifference to Mr. Thomas's health and welfare in violation of the Eighth Amendment.  To state a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States.  See, e.g., Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995) and Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)).  The Eighth Amendment

---

[9]  Curiously, Plaintiff does not affirmatively state that Thomas learned of his injury after July 16, 2002.  Plaintiff only argues that CMS did not tell him he had HCV and did not provide treatment for his condition until approximately 2000. Nonetheless, since this is Defendants' Motion for Summary Judgment, all facts are viewed in the light most favorable to Plaintiff and it is Defendants' burden to show Thomas knew of his injury before July 16, 2002 and his claim therefore barred as a matter of law.  Celotex, 477 U.S. at 330.

prohibits "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). To state a claim for violation of this Eighth Amendment right, a prisoner must show that: (1) their medical needs are serious; and (2) the defendants showed deliberate indifference to those needs. Id.

There is no dispute that CMS was under contract with the State to provide medical care to inmates at all times relevant to this case and that Defendants were acting under color of state law. Further, there is no dispute that Thomas's HCV presented a serious medical need. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (finding that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious'"). The Defendants argue, however, that they were not deliberately indifferent to Thomas's serious medical needs in violation of the Eight Amendment.

"Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F. Supp. 2d 217, 228

(D.N.J. 2000).  Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); White, 897 F.3d at 110.

The Third Circuit has found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment.  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985) and Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir. 1981)).  The Court has also held that needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, violates the Eighth Amendment.  Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003); see also Lanzaro, 834 F.2d at 346 ("[D]eliberate indifference is demonstrated '[w]hen ... prison authorities prevent an inmate from receiving

recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment.'"); Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White, 897 F.2d at 110.

### 1. Duty to Screen

Defendants first argue that they were not deliberately indifferent because there is no constitutional duty to screen inmates for HCV.  We agree.  It is well settled that a prison has a duty to screen newly admitted inmates for potentially dangerous and easily communicable diseases.  See, e.g., Helling v. McKinney, 509 U.S. 25, 35 (1993) (concluding that inmate who was involuntarily exposed to environmental tobacco smoke so that his future health was unreasonably endangered could allege an Eighth Amendment violation); Jolly v. Coughlin, 76 F.3d 468, 477 (2nd Cir. 1996) (affirming that correctional officials have an affirmative obligation to protect inmates from infectious disease); Bolden v. U.S., No. 93-5463, 1994 WL 246173, at *2 (E.D.Pa. June 7, 1994) (stating that failure to screen inmates for contagious diseases is a prison condition which may constitute cruel and unusual punishment); Cody v. Hillard, 599 F. Supp. 1025, 1054 (S.D.S.D. 1984) (finding that practice of double-celling newly admitted inmates along with failure to timely screen inmates for potentially dangerous communicable diseases constitutes a serious deficiency).

One such communicable disease that has been found highly contagious and require screening is Tuberculosis ("TB").  See Crocamo v. Hudson County Correctional Center, No. 06-1441, 2007 WL 1175753, at *6 (D.N.J. Apr. 19, 2007) (finding that inmates can state Eighth Amendment claim for confinement in a cell with an inmate who has a serious contagious disease that is spread by airborne particles, such as tuberculosis); Bolton v. Goord, 992 F. Supp. 604, 628 (S.D.N.Y. 1998); Karolis v. New Jersey Dept. of Corrections, 935 F. Supp. 523, 527 (D.N.J. 1996) (finding TB highly contagious and upholding prison's testing program over inmates's religious freedom objections).  Courts have found that failure to screen for TB can violate an inmate's constitutional rights.  See Crocamo, 2007 WL 1175753, at *6; DeGidio v. Pung, 920 F.2d 525, 529-33 (8th Cir. 1990) (affirming District Court's finding that prison's TB screening and treatment program was deficient and violated Eighth Amendment).  TB is considered highly contagious because it can be spread by droplet nuclei, which are airborne particles that are transmitted when an infected individual sneezes, coughs, or speaks.  See Karolis, 935 F. Supp. at 527.  Uninfected individuals become infected when they inhale the droplet nuclei and the TB bacteria settles in their lungs and multiplies.  Id.

Not all communicable diseases found in prisons, however, are as highly contagious or transmitted through airborne particles

like TB.  HIV/AIDS "is transmitted through sexual intercourse, the sharing of drug needles, or to babies of infected mothers before or during birth."  Glick v. Henderson, 855 F.2d 536, 539 n.1 (8th Cir. 1988).  In Glick, the court denied Plaintiff's claim that the prison should have administered HIV tests to all inmates and staff members and segregated all inmates with the AIDS virus from all other uninfected inmates after finding that the possibility of transference of AIDS through casual contact was too remote.  Id.; see also Crocamo, 2007 WL 1175753, at *6 (stating that confinement in the same cell as an HIV-positive inmate does not violate the Eighth Amendment); Gregory v. PHS Inc., No. A-00-467-SLR, 2001 WL 1182779, at *4 (D. Del. Sept. 21, 2001) (finding that inmate did not present Eight Amendment violation for failure to test for HIV after treatment was provided for a bite wound because the decision to test for HIV is a medical determination left to the discretion of a physician and not the court).

Here, Plaintiff has not presented any evidence indicating that HCV is a highly contagious disease like TB that can be easily transmitted from one inmate to another through sneezing, coughing, or speaking.  To the contrary, HCV appears to be more similar to HIV in that it is transmitted only by direct exposure to infected body fluids, such as occurs through sexual intercourse or the sharing of needles.  See Crocamo, 2007 WL

20

1175753, at *7 (holding that without the assistance of an expert report the court was not qualified to state definitively how viruses are transmitted).  Accordingly, there is nothing in the record before this Court that HCV is such a potentially dangerous and easily communicable disease that a general constitutional duty to screen asymptomatic inmates for HCV is required.

This case, however, is not a duty to screen case.  Here, Thomas was tested for HCV and Defendants knew that he had the disease in 1996.  Plaintiff is not arguing that Defendants should have screened Thomas prior to 1996.  Rather, Plaintiff is arguing that they should have told him that he had HCV when he was diagnosed and provided him with treatment.

### 2.  Drug Therapy Treatment

Defendants next argue that their failure to provide drug therapy treatment to Thomas was not deliberate indifference.  They assert that Thomas was not a candidate for drug treatment with either Interferon or Ribivirin, the two available and commonly used drugs to treat HCV.  In support of this argument, Defendants cite to Dr. Turner's deposition testimony in which she stated that Thomas's poorly controlled diabetes, depression, chronic renal insufficiency, and anemia were absolute contraindications for HCV drug therapy.  Dr. Turner also testified that his coronary artery disease and previous heart attack were relative contraindications for drug treatment, and

that Mr. Thomas was not a candidate for drug treatment from the time she examined him in 2000.  Plaintiff, however, disputes Dr. Turner's conclusions and argues that according to her expert, Bennett Cecil, M.D., and the FBOP guidelines, diabetes is only a relative contraindication for drug therapy.  Plaintiff also argues that Thomas's diagnosis of uncontrolled diabetes was not substantiated during certain months in 1997, 1998, and 1999, because Defendants did not take any hemoglobin laboratory tests.

While there is no constitutional duty to provide inmates with a particular drug, the failure to provide a medication or treatment must be based on sound medical judgment.  See Christy v. Robinson, 216 F. Supp. 398, 413 (D.N.J. 2002) (finding that courts will not second guess the adequacy of a particular course of treatment if it is based on sound professional judgment). Here, Defendants have presented evidence that the decision to not provide Thomas with Interferon or Ribivirin after he was examined by Dr. Turner in 2000 was based on Dr. Turner's judgment that his medical condition prevented such treatment.  Even though Plaintiff's expert may dispute her conclusion, disagreements over medical judgments do not amount to Eighth Amendment claims.  See White, 897 F.2d at 110.  Even assuming that Dr. Turner was mistaken and Thomas could have been treated with drugs even though he had diabetes, such a mistake in judgment would at most amount to a medical malpractice claim, not an Eighth Amendment

22

violation.  See Estelle, 429 U.S. at 105-06; White, 897 F.3d at
110.  Furthermore, Dr. Turner's decision not to treat Thomas with
particular drugs was based on more than just contraindications
from Thomas's poorly controlled diabetes.  It was also based on
his history of depression, chronic renal insufficiency, anemia
and coronary artery disease.  The FBOB guidelines provide that
history of major depression is an absolute contraindication to
treatment with interferon.  Further, the FBOB guidelines list
diabetes as a relative contraindication.  Thus, the Court finds
that Dr. Turner's decision in 2000 not to prescribe certain drugs
to Thomas to treat his HCV was based on sound medical judgment.
See Christy, 216 F. Supp. 2d at 416 (concluding that the decision
not to treat Plaintiff's HCV with interferon or ribaririn was not
deliberate indifference).

The failure to treat Thomas with drug therapy prior to 2000,
however, is not addressed by CMS.  Defendants have presented no
facts explaining why it decided not to treat Thomas for his HCV
from 1996 to 2000.  Although Defendants state generally that
there is no constitutional right to a particular drug and that
Interferon or Ribivirin could worsen a prisoner's condition,
neither of these statements address why Thomas was not provided
with drug therapy from 1996 to 2000.  The record is clear that
Defendants knew Thomas had HCV in 1996 and in 1998, but did not
inform him of his diagnosis or provide him with drug treatment.

See Lanzano, 834 F.2d at 346 (stating that deliberate indifference exists were there is knowledge of need for medical care but care is intentionally refused).  Accordingly, these facts are sufficient to go to a jury on the issue of whether Defendants were deliberately indifferent to Thomas's serious medical needs from 1996 to 2000.

### 3.  Vicarious Liability

Defendants also argue that CMS and its corporate representatives cannot be liable under Section 1983 because they cannot be held vicariously liable under a theory of respondeat superior as a matter of law.[10]  Indeed, it is well settled that liability under Section 1983 may not be based on the doctrine of respondeat superior.  See Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993).  However, even though CMS and its corporate representatives cannot be held liable under a theory of respondeat superior, there are situations "where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983."  Natale v.

---

[10]  Defendants also argue that CMS and its corporate representatives cannot be held liable because Thomas cannot prove an underlying constitutional violation.  As explained supra, Thomas has alleged sufficient facts to go to a jury on the issue of whether Defendants were deliberately indifferent in failing to inform him of his HCV from 1996 to 2000 and in failing to provide specific treatment for his HCV during that time period in violation of his Eight Amendment rights.

Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978)).

In Natale, the court outlined three such situations in which an entity may be rendered liable for the actions of its employees.  Id. at 584 n.10 (relying on Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 417 (1997) (Souter, J. dissenting)).[11]  First, "where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.'" Id.  Second, "where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.'" Id.  Finally, "where 'the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Id.

The third situation may arise where a "policymaker sits on his hands after repeated, unlawful acts of subordinate officers."

---

[11] The Third Circuit made clear that it cited to Justice Souter's dissenting opinion for the summary of the three situations, and not for its conclusion about the requisite evidentiary showing in those situations.

Brown, 520 U.S. at 418.  "Such a policy choice may be inferred
even without a pattern of acts by subordinate officers, so long
as the need for action by the policymaker is so obvious that the
failure to act rises to deliberate indifference."  Id.  In
analyzing the third situations, "[d]eliberate indifference is
thus treated, as it is elsewhere in the law, as tantamount to
intent, so that inaction by a policymaker deliberately
indifferent to a substantial risk of harm is equivalent to the
intentional action that setting policy presupposes."  Id.

Here, Plaintiff argues that CMS and its corporate
representatives are vicariously liable for the actions of the
treating physicians because they fall within the third situation.
In support of this argument, Plaintiff refers to certain
provisions in the contract between the State and CMS, which
indicate that CMS had a contractual duty to provide medical care
to the inmates, design and implement policies and procedures for
providing care, monitor health services and medical records, and
to train health care personnel.  Plaintiff also presented the
deposition testimony of Dr. Turner who stated that as of January
2000, she did not know of any CMS policy or procedure to follow
with regard to HCV and was treating HCV infected inmates based
upon her general medical knowledge.  Plaintiff further provides
the deposition testimony of Richard Cevasco, E.D.D., Assistant
Director in the Division of Operations for the NJDOC, who stated

that as of October 2000, CMS was not treating any inmates with HCV with the drugs Interferon or Ribivarin, and that it was not until 2001 that one of the 1,025 inmates with HCV was provided with drug therapy.  Plaintiff also relies on Dr. Cevasco's testimony that CMS did not have an HCV policy in place until it formally adopted the FBOP guidelines in approximately 2003.

Thus, Plaintiff has presented sufficient facts for a factfinder to conclude that from 1996 until approximately 2001, or later, that there was a need for CMS to institute a policy or procedure for informing inmates that they had HCV and for treating inmates infected with HCV, but that CMS failed to act in implementing such policy or procedure.  See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979) (holding that when inmates with serious mental illnesses are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by Estelle); see also Lanzaro, 834 F.2d at 347 (stating that "[d]eliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates'") (quoting Todaro v. Ward, 565 F.2d 48, 53 (2d Cir. 1977)).  Plaintiff has also alleged sufficient facts that could show that the failure of CMS during this time to inform and treat inmates with HCV while

knowing that the inmates were infected with HCV could amount to the requisite intent needed to prove deliberate indifference to a substantial risk of harm. See Brown, 520 U.S. at 418.

### 4. Individual CMS Defendants

Defendants also argue that the individually named Defendants cannot be liable because they were not personally involved in the care of Thomas.  Given their different roles, the claims against Defendants named in this case are William Andrade, James J. Neal, M.D., James Ruman, R.N., Rock Welch, and Abu Ashan, M.D. (hereinafter collectively, "Supervisory Defendants") and Defendants Manuel Veloso, M.D., Carol Gallagher, N.P., and Alyn R. Caulk, M.D. (hereinafter collectively, "Treating Defendants") will be addressed in turn.

### (a) Liability of Supervisory Defendants

The CMS Defendants argue that the Supervisory Defendants cannot be liable under Section 1983 because Plaintiff has failed to produce any evidence that they were personally involved in any aspect of Thomas's care.  Absent such evidence, CMS Defendants argue, there can be no vicarious liability pursuant under Section 1983.  Plaintiff argues, in opposition, that the Supervisory Defendants were directly responsible for the implementation of an HCV policy or procedure but failed to do so.

For a supervisor to be personally liable, a plaintiff must show that the supervisor's conduct caused the deprivation of a

federally protected right, see Kentucky v. Graham, 473 U.S. 159, 166 (1985), and that the supervisor was personally involved in the deprivation, see West v. Atkins, 487 U.S. 42, 48 (1988). Personal involvement can be shown if the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). A supervisor may be personally liable under Section 1983 "if he or she participated in violating the Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." Goodrich v. Clinton County Prison, 214 Fed. Appx. 105, 112 (3d Cir. 2007) (citing A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004)). We address the alleged facts against each of the Supervisory Defendants separately.

Defendant James J. Neal, M.D. was CMS's Statewide Medical Director from 1996 through November 2000. He testified that part of his responsibilities was to co-develop policies and procedures for CMS with the five regional or group medical directors and that he had discussions with them about the need to develop corporate policies on HCV, but that no policy was issued.

Defendant Abu Ashan, M.D. was a Group Medical Director for CMS from approximately 1997 until 2001, became the Statewide Medical Director from 2001 to 2003, and then Group Medical

Director for the Southern Region in September 2003.  Dr. Ashan testified that he met with Dr. Neal while Dr. Neal was statewide director and received a copy of the FBOP guidelines for HCV in 2000 or 2001.  Dr. Ashan also testified that the group medical directors had the responsibility for overseeing their assigned prisons, and that he was assigned four prisons as Group Medical Director.

The deposition testimony of the Vice President of CMS, Louis C. Tripoli, M.D., showed that Defendant Rock Welch was the Regional Vice President sometime in the late 1990s, that Defendant William Andrade was the National Associate Medical Director for CMS sometime in the late 1990s, and Defendant James Ruman was the Regional Vice President of CMS for New Jersey sometime after Rock Welch left.  Also, the testimony of Dr. Cevasco indicates that a letter was sent to Ruman from the NJDOC stressing that CMS was not actively treating inmates with HCV.

As set forth above, Plaintiff has alleged sufficient facts for a factfinder to conclude that from 1996 until approximately 2000, or later, CMS failed to implement an HCV policy or procedure for informing inmates of their HCV or providing them with adequate treatment.  Likewise, Plaintiff has also presented sufficient facts for a factfinder to conclude that three of the Supervisory Defendants -- Neal, Ruman, and Ahsan -- had the responsibility for developing policies and procedures, including

an adequate HCV policy, for the inmates.  Plaintiff has also alleged sufficient facts for a factfinder to conclude that Neal, Ruman, and Ahsan had knowledge of the lack of an HCV policy and acquiesced in the physicians' failure to inform or treat HCV infected inmates.  See Natale, 318 F.3d at 583 (finding that a reasonable jury could conclude that facility's policy of permitting the first 72 hours of incarceration to pass before an inmate was to be seen by a doctor to rise to deliberate indifference to the plaintiff's medical needs where the plaintiff was diabetic and needed frequent insulin shots).

However, as to the remaining two Supervisory Defendants (Andrade and Welch), Plaintiff does not present any facts beyond their titles that indicate they had responsibility for developing or implementing an HCV policy, or that they knew that their subordinates were failing to inform the inmates of or treat them for HCV.  Accordingly, since respondeat superior is not available under Section 1983, Plaintiff's Section 1983 claims against William Andrade and Rock Welch must be dismissed.

### (b)  Liability of Treating Defendants

CMS also moves to dismiss Plaintiff's Section 1983 claims against the individual Defendants on the ground that none of them treated Thomas prior to 1998.  In support of their argument, Defendants assert:

> Plaintiff can provide no evidence that any of
> the named Defendants were actively treating

31

> Plaintiff prior to 1998.  Therefore, Plaintiff
> cannot show that any of the named Defendants
> were aware of Plaintiff's serious medical need
> prior to 1998 and were deliberately
> indifferent to his needs.

The Court will assume that Defendants mean that none of the individual Defendants was responsible for caring for Thomas (not Plaintiff) prior to 1998 and, therefore, could not have known that he had HCV.  Otherwise, their assertion that Defendants were not treating Thomas, when presumably they should have been, seems to support Plaintiff's claims of deliberate indifference.  Even so, as the Court has discussed <u>supra</u>, Thomas did not learn of his HCV until 2000.  Therefore, any individual Defendant who had the responsibility of informing Thomas of his diagnosis with HCV or prescribing treatment for his condition prior to 2000, not prior to 1998, is potentially liable for violation of Thomas's Eight Amendment rights.

Notwithstanding the flaws in CMS's argument, Plaintiff must be able to prove facts that could show that the individually named Defendants had a duty to inform or treat Thomas from 1996 and 2000, but did not do so.  <u>See</u> <u>Rouse</u>, 182 F.3d at 197.  With regard to the Supervisory Defendants, the Court has already concluded that Plaintiff's Section 1983 claims against Andrade and Welch must be dismissed, but that Plaintiff has alleged facts that capable of showing that Neal, Ashan, and Ruman had supervisory responsibility for developing and implementing HCV

policy and that no such policy was implemented even though they knew certain inmates were infected with HCV.

With regard to the Treating Defendants, however, Plaintiff has not alleged any facts capable of showing that either Dr. Veloso or Nurse Gallagher had a duty to inform Thomas of his HCV diagnosis or treat him for it.  First, Plaintiff in her moving papers makes no argument at all regarding Dr. Veloso.  The Court finds no facts alleged as to when, if ever, or why Dr. Veloso treated Thomas.  The Court also finds that no facts have been put forth with respect to any duty Dr. Veloso may have had to treat Thomas.  Since Plaintiff has not alleged any facts capable of stating a Section 1983 claim against Dr. Veloso, this claim must be dismissed.

Likewise, Plaintiff has not presented sufficient facts to show that Nurse Gallagher was deliberately indifferent to Thomas's serious medical needs.  The only allegation regarding Nurse Gallagher raised by Plaintiff is that "Dr. [sic] Gallagher" saw Thomas on December 13, 2001.  As stated supra, after 2000, Thomas was informed of his HCV and was being provided with adequate treatment based on Dr. Turner's medical judgment.  Plaintiff has not alleged that Nurse Gallagher saw or examined Thomas between 1996 and 2000, or that she had any duty to inform Thomas of his HCV or provide treatment. Thus, Plaintiff's Section 1983 claim against Carol Gallagher, N.P., is dismissed.

Finally, Dr. Caulk filed a separate Motion for Summary Judgment, joining CMS's motion.  In his motion, Caulk states that he began providing care to Thomas in 2000.  The record shows that he first started treating Thomas in February 2000, after the time when Dr. Turner had examined Thomas, informed him he had HCV, and made the decision based on her medical judgment that Thomas was not a candidate for drug therapy treatment.  Plaintiff has not filed any opposition to Dr. Caulk's motion or alleged any facts that could show that he had a duty prior to 2000 to either inform Thomas that he had HCV or provide him with treatment for his condition.  Thus, Plaintiff's Section 1983 claim against Dr. Caulk is dismissed.

### 5.   "Good Faith Immunity"

CMS Defendants raised for the first time in their reply brief the argument that the individual CMS Defendants should be dismissed on the basis of "good faith immunity."  As a preliminary matter, the Court notes that the purpose of a reply brief is to respond only to the non-moving party's arguments or to reinforce arguments made in the moving party's original brief. See Harbour Cove Marine Serv. v. Rabinowitz, No. 02-1695, 2005 WL 1038957, at *4 (D.N.J. May 3, 2005).  Arguments raised for the first time in a reply brief will be disregarded.  See Bayer AG v. Schein Pharmaceutical, 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (disregarding arguments raised for the first time in a reply

brief), aff'd, 301 F.3d 1306 (3d. Cir. 2002).  Further, CMS
Defendants ask this Court to apply the reasoning outlined in
Saucier v. Katz, 533 U.S. 194 (2001), which dealt with qualified
immunity for state actors, to claims of private actors sued under
Section 1983.  Thus, not only do the CMS Defendants raise an
entirely new argument in their reply brief, but also ask the
Court to devise a new brand of qualified immunity for private
actors.[12]  If the CMS Defendants were serious about raising such
an argument, they should have raised it in their original motion
which would have given Plaintiff an opportunity to fully respond.
Thus, we do not reach the merits of the CMS Defendants' "good
faith immunity" argument since it was impermissibly raised for
the first time in their reply brief.

### D.  Negligence

Plaintiff alleges in Count II of the Complaint that
Defendants CMS, Andrade, Neal, Ruman, Welch, and Ahsan
negligently breached their duty to formulate and implement

---

[12]  In Wyatt v. Cole, 504 U.S. 158 (1992), the Supreme Court
found that qualified immunity, as enunciated in Harlow v.
Fitzgerald, 457 U.S. 800 (1982), is not available for private
Defendants faced with Section 1983 liability for invoking a state
replevin, garnishment, or attachment statute.  See Kimes v.
Stone, 84 F.3d 1121, 1128 (9th Cir. 1996) (interpreting decision
in Wyatt to hold that private actors are not entitled to the
absolute immunity granted to some government officials and that
"private persons, who conspire with state officials to violate
constitutional rights" are not entitled to the good faith
immunity, also known as qualified immunity, available to other
public officials").

policies to assure Plaintiff's health and welfare, employ
competent healthcare providers, and properly supervise their
healthcare providers.  The Court notes that the CMS Defendants
seem to have confused Count II's negligence claim against CMS and
the Supervisory Defendants with Count III's medical malpractice
claim against the Treating Defendants, and seeks to dismiss both
on the same basis.  The CMS Defendants seek to dismiss
Plaintiff's medical malpractice/negligence claims on the grounds
that there was no physician-patient relationship between Thomas
and either Andrade, Neal, Ruman, Welch, or Ashan, M.D. from 1996
until July 18, 2002.  While such a consideration would be
relevant to a claim for medical malpractice, the Court notes that
no such claim has been brought against CMS or the Supervisory
Defendants.  Only Treating Defendants are alleged to have
committed medical malpractice.  Moreover, the CMS Defendants'
arguments do nothing to undermine Plaintiff's negligence claim.

   With respect to the issue of the Supervisory Defendants
alleged failure to implement appropriate policies and procedures,
the Court has already found that a genuine issue of material fact
exists as to Defendants Neal, Ruman, and Ahsan, but not as to
Defendants Andrade or Welch in the Section 1983 context.
Accordingly, for the same reasons expressed above regarding this
issue, the Court will likewise dismiss Count II on this issue
with respect to Defendants Neal, Ruman, and Ahsan, but not as to

36

Defendants Andrade or Welch.  With respect to the remainder of Count II, however, the Court finds that Defendants have failed to carry their burden of demonstrating that they are entitled to judgment as a matter of law.

### E.  Medical Malpractice

Plaintiff brought medical negligence or medical malpractice claims against Defendants Caulk, Veloso, and Gallagher in Count III of the Complaint.  The CMS Defendants seek to dismiss Plaintiff's medical malpractice claim on the ground that there was no physician-patient relationship between Thomas and Veloso, or physician-nurse relationship between Thomas and Gallagher from 1996 until July 18, 2002.[13]

Under New Jersey law, "[a] Plaintiff claiming medical malpractice 'must prove the applicable standard of care, that a deviation has occurred, and that the deviation proximately caused the injury.'" Gordon v. Matez, 2006 WL 3299180, at *3 (N.J. Super. App. Div. Nov. 15, 2006) (citing Verdicchio v. Ricca, 179 N.J. 1, 23 (1985)).  "An action for medical malpractice 'is a kind of tort action in which the traditional negligence elements

---

[13]  Although Dr. Caulk joined CMS's motion, he did not join in their argument (argument 4) for dismissal of Plaintiff's medical malpractice claims.  Dr. Caulk only joined in arguments 2 (statute of limitations), 3A (Section 1983 claim) and 5 (wrongful death).  Therefore, Dr. Caulk's motion is in essence a partial motion for summary judgment.  Although his motion is granted, the medical malpractice claim remains as against Dr. Caulk at this time.

are refined to reflect the professional setting of a
physician-patient relationship.'" Id.

    Plaintiff objects to the dismissal of the malpractice claims
against Dr. Veloso and Nurse Gallagher on the grounds that her
expert, Bennett Cecil, M.D. opined that the CMS staff gave less
than the standard care of treatment regarding Thomas's symptoms
of HCV cirrhosis and, therefore, "Dr. [sic] Gallagher" who
treated Thomas on December 13, 2001 was negligent.  This
argument, however, is flawed.  First, Plaintiff does not
highlight any portion of Dr. Cecil's expert opinion regarding Dr.
Veloso or the standard of care owed by Dr. Veloso.  Indeed,
Plaintiff does not allege any facts at all concerning the care
provided Dr. Veloso.  There is no information on why, when or if
Dr. Veloso treated Thomas.  Second, as the CMS Defendants point
out, Nurse Gallagher is not a medical doctor and there are no
facts as to what treatment Nurse Gallagher provided to Thomas
aside from her ordering a "Lasik" procedure for Thomas on
December 13, 2001.  Plaintiff has not alleged facts that could
establish what care Nurse Gallagher provided that deviated from
the standard of care for a nurse practitioner.  Given that no
facts have been alleged that could support a finding that either
Dr. Veloso or Nurse Gallagher deviated from the applicable
standard of care for their profession, Plaintiff's medical
malpractice/negligence claims against them are dismissed.

38

**IV.   CONCLUSION**

For the foregoing reasons, the CMS Defendants' Motion for Summary Judgment is denied in part and granted in part.  Dr. Caulk's Motion for Summary Judgment is granted.  An Order consistent with this Opinion will be entered.


Dated: March 17, 2009             s/ Noel L. Hillman
                                  NOEL L. HILLMAN, U.S.D.J.


At Camden, New Jersey